## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | **CRIMINAL COMPLAINT** |
| v. : | |
| : | Mag. No. 17-4123 |
| BRIAN PARKER, and : | |
| VICTORIA KOLESKI : | **FILED UNDER SEAL** |

I, David J. Formalarie, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### SEE ATTACHMENT A

I further state that I am a Task Force Officer with the United States Drug Enforcement Administration, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Task Force Officer David J. Formalarie
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,
on August 23, 2017, in Essex County, New Jersey

_____
HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

## **COUNT ONE**
## **(Conspiracy to Distribute Controlled Substance Analogues)**

From in or around May 16, 2016 through on or about August 3, 2017, in Monmouth County, in the District of New Jersey and elsewhere, the defendants,

BRIAN PARKER, and
VICTORIA KOLESKI

did knowingly and intentionally conspire and agree with each other and with others to distribute and to possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of one or more Schedule I controlled substance analogues, as defined in Title 21, United States Code, Section 802(32)(A), namely: (A) 3,4-Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide ("U-47700"); (B) α-Pyrrolidinohexanophenone ("A-PHP"); and (C) 3-Methoxyphencyclidine ("3-MEO-PCP"), knowing that the substances were intended for human consumption, contrary to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 813.

In violation of Title 21, United States Code, Section 846.

## COUNT TWO
### (Distribution of a Controlled Substance Analogue)

On or about May 21, 2016, in Monmouth County, in the District of New Jersey and elsewhere, the defendant,

### BRIAN PARKER

did knowingly and intentionally distribute and possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of a Schedule I controlled substance analogue, as defined in Title 21, United States Code, Section 802(32)(A), namely 3,4-Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide ("U-47700"), knowing that the substance was intended for human consumption.

In violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 813, and Title 18, United States Code, Section 2.

## COUNT THREE
### (Distribution of Controlled Substance Analogues)

On or about July 5, 2017, in Monmouth County, in the District of New Jersey and elsewhere, the defendant,

> BRIAN PARKER, and
> VICTORIA KOLESKI

did knowingly and intentionally distribute and possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of one or more Schedule I controlled substance analogues, as defined in Title 21, United States Code, Section 802(32)(A), namely:
(A) α-Pyrrolidinohexanophenone ("A-PHP"); and (B) 3-Methoxyphencyclidine ("3-MEO-PCP"), knowing that the substances were intended for human consumption.

In violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 813, and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, David J. Formalarie, am a Task Force Officer with the United States Drug Enforcement Administration ("DEA"). I have been personally involved in the investigation of this matter. The information contained in this Criminal Complaint is based on my personal knowledge and on information obtained from other sources, including but not limited to: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly-available information relating to the defendant; and (c) my review of audio recordings and other recorded communications. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a Complaint, I have not included each and every fact known to the Government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## Background

1. Since in or around May 2016, law enforcement agents with the DEA and the United States Postal Inspection Service ("USPIS") have been investigating the sale of controlled substances and controlled substance analogues through the Internet.

2. Information learned over the course of investigation has revealed that defendant BRIAN PARKER ("PARKER") has been selling controlled substance analogues and other chemicals online. Specifically, PARKER controls two Internet-based companies, Unbeatablechems ("UBC") and RC Powders ("RCP"), which he operates through the websites www.unbeatablechems.com (the "UBC Website") and www.rcpowders.com (the "RCP Website").

3. PARKER has previously been convicted of at least two federal narcotics and narcotics-related crimes. On or about September 18, 2007, PARKER pleaded guilty in the United States District Court for the Southern District of Georgia to conspiracy to distribute and possess with intent to distribute anabolic steroids. *See United States v. Parker*, Crim. No. 07-0034-LGW, D.E. 24, 31. On or about June 20, 2011, PARKER plead guilty in the U.S. District Court for the Eastern District of Pennsylvania to fifteen counts of introducing misbranded drugs into interstate commerce, conspiracy to commit the same, and failure to register a manufacturing facility. *See United States v. Parker*, Crim. No. 11-181 (RBS), D.E. 29, 28. According to the Indictment in the Eastern District of Pennsylvania to which Parker plead guilty, Parker and

4

his co-conspirators used Internet websites to offer prescription drugs for sale without a license. *Id.*, D.E. 1, at 6. That Indictment also alleged that Parker "manufactured misbranded drugs in [his] residence," by "converting bulk active and inactive ingredients into capsules or tablets." *Id.*, at 7.

### The May 2016 Overdose Death and Shipment of U-47700

4. The substances sold by PARKER have been linked to an overdose death which occurred in May 2016. More specifically, on or about May 22, 2016, law enforcement officers were dispatched to a residence in or around Madison, Wisconsin in response to a report of a 37-year-old male who had stopped breathing (the "Victim"). When the officers arrived at the Victim's residence, they found the Victim deceased. An autopsy performed on the Victim confirmed that the Victim's death was caused by acute intoxication due to the combined effects of a substance called U-47700 and Benzodiazepine Analogue (Etizolam).[1]

5. U-47700, known by the chemical name 3,4-Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide, is a synthetic opioid that is several times more potent than morphine. U-47700 is substantially similar in chemical structure to 3,4-dichloro-N-[(1-dimethylamino) cyclohexylmethyl] benzamide ("AH-7921"), a Schedule I controlled substance. Moreover, U-47700 has an effect on the human central nervous system that is substantially similar to AH-7921.[2]

6. At the scene of the Victim's overdose, law enforcement officers recovered several mail parcels that were addressed to the Victim (the "Victim Parcels") and had been mailed from a UPS box located in or around Wall, New Jersey (the "Wall UPS Store"). One or more of the Victim Parcels contained full glass vials labeled "U-47700." The listed sender of the Victim Parcels was "UBC." A further investigation of evidence recovered at the Victim's residence, including multiple invoices for purchases of U-47700, revealed that the Victim had been ordering U-47700 and other substances from the UBC Website that

---

[1] Benzodiazepines, such as Etizolam, are a class of drugs that produce central nervous system depression and are commonly prescribed to treat insomnia and anxiety. Etizolam is not currently listed under the Controlled Substances Act, but does not have an accepted medical use in the United States.

[2] AH-7921 was given Schedule 1 controlled substance status on or about May 16, 2016. On or about November 14, 2016, U-47700 was given Schedule I controlled substance status. Thus, from on or about May 16, 2016 through November 14, 2016, U-47700 was considered a controlled substance analogue as that term is defined by the Analogue Act, 21 U.S.C. § 813. On or about November 14, 2016, U-47700 became a Schedule I controlled substance within the meaning of 21 U.S.C. § 802.

was maintained and operated by PARKER.

7. One of the Victim Parcels recovered from the scene was an unopened parcel that had been sent to the Victim by "UBC" in Wall, New Jersey on or about May 21, 2016 (the "May 21, 2016 Victim Parcel"). The May 21, 2016 Victim Parcel had been mailed using a prepaid postage label printed through Stamps.com associated with the client number ending in 912 (the "Stamps.com Account"). According to postal records, the return address on the May 21, 2016 Victim Parcel was a UPS Store mailbox registered to PARKER.

8. Based on the consent of the Victim's family members, the May 21, 2016 Victim Parcel was seized and searched by law enforcement. Inside the May 21, 2016 Victim Parcel, law enforcement agents found approximately 16 plastic bottles a clear liquid that were each marked "U-47700." Agents also found approximately 10 oral syringes inside the May 21, 2016 Victim Parcel. The bottles from inside the May 21, 2016 Victim Parcel were tested in a laboratory and found to contain approximately 306.806 grams of U-47700.

### PARKER and KOLESKI's Conspiracy

9. After learning of the Victim's overdose, law enforcement agents began investigating the UBC Website.

10. Information gathered over the course of the investigation has revealed that PARKER uses co-conspirators located in New Jersey and elsewhere to send and receive packages for his narcotics distribution business. More specifically, those co-conspirators receive raw materials from China or elsewhere through the mail, which they then re-package and send to PARKER. Once PARKER receives the raw materials, PARKER uses a lab and/or lab equipment to manufacture those raw materials into the finished product chemicals that he sells online. Once the finished product is manufactured by PARKER, PARKER then transports the finished product back to his co-conspirators so that they can package it and ship it out to PARKER's online customers.

11. Law enforcement agents have also determined that PARKER uses social media websites such as "Reddit" to discuss his controlled substance analogue business. For instance, PARKER posts communications on Reddit about his business using online handles associated with UBC and RCP (each, a "Parker Reddit Profile").

### *The January 2017 UC Purchase*

12. On or about January 19, 2017, an undercover agent ("UC") sought to purchase Benzodiazepines, including Etizolam, from PARKER through the UBC Website. The UC sent an email to an account associated with the UBC Website (the "UBC Email Account"), and inquired as to potential payment methods. Thereafter, the UC used "Venmo"[3] to make a purchase of approximately 5 bottles of "Clon liquids," and approximately 5 bottles of "Etiz Liquids" (the "January UC Purchase").[4] A short time later, the UC received an invoice for the January UC Purchase from the UBC Email Account, as well an email indicating that the products would be shipped as soon as possible.

13. On or about January 23, 2017, law enforcement agents established surveillance at an address in or around Farmingdale, New Jersey where KOLESKI resides (the "Koleski Residence"). At approximately 2:51 p.m., agents observed KOLESKI leave the Koleski Residence, carrying a large plastic bag. Thereafter, law enforcement agents followed KOLESKI as she travelled to the United States Post Office in or around Farmingdale, New Jersey (the "Farmingdale Post Office") and brought the large plastic bag inside. Shortly thereafter, KOLESKI left the Farmingdale Post Office empty-handed. After KOLESKI was observed leaving the Farmingdale Post Office, law enforcement agents checked the tracking number for the January UC Purchase that was provided to the UC through the UBC Website. The tracking number related to the January UC Purchase indicated that the shipment had been accepted at the Farmingdale Post Office at approximately 3:12 p.m.

14. Two days later, on or about January 25, 2017, law enforcement agents received a parcel containing the chemicals ordered during the January UC Purchase (the "January 2017 UC Parcel"). The January 2017 UC Parcel had been sent on or about January 21, 2017 from "Shipping station" at an address in or around Wall, New Jersey, and had been mailed using the same Stamps.com Account as the May 21, 2016 Victim Parcel. When agents opened the January 2017 UC Parcel, they found that it contained approximately five (5) clear plastic vials containing a clear liquid that were labeled "CLONAZ 2MG." Also inside were five (5) clear plastic vials containing a clear liquid that were labeled, "ETIZ 5MG B#1." The January 2017 UC Parcel also contained approximately 2 oral syringes. The contents of the January 2017 UC Parcel are still undergoing laboratory testing, but based on information gathered over

---

[3] Venmo is an Internet-based program that allows individuals to send and receive money electronically.

[4] Based on the investigation, "Clon liquids" referred to Clonazolam and "Etiz Liquids" referred to Etizolam, both Benzodiazepines.

7

the course of the investigation, it is believed to contain the Benzodiazepines Clonazolam and Etizolam.

### *The July 2017 Parcel Interdictions*

15. On or about June 25, 2017, PARKER used a Parker Reddit Profile associated with RCP to post a message to Reddit. PARKER posted that he would be closing the RCP Website for a day, packing up all of his inventory, and taking it to his "UBC shipper." On or about June 28, 2017, PARKER again posted to Reddit that he would be dropping off his "stock" to his UBC shipping contact.

16. Based on the above Reddit posts, on or about June 28, 2017, law enforcement agents established surveillance at PARKER's residence, located in or around Long Island City, New York (the "Parker Residence").[5] Law enforcement agents also established surveillance at the Koleski Residence. At approximately 10:56 a.m., agents observed PARKER enter the public parking garage located below the Parker Residence carrying a white garbage bag (the "Bag"). Based on the agents' observations, the Bag did not appear to contain large boxes and/or parcels, but rather, many smaller objects. PARKER placed the Bag into the trunk of his vehicle, then entered the vehicle and drove it out of the parking garage.

17. Law enforcement agents then maintained surveillance of PARKER as he drove to and entered the driveway of the Koleski Residence. At the Koleski Residence, agents observed PARKER exit his vehicle, open the trunk, retrieve the Bag, and carry the Bag into the Koleski Residence. A short time later, PARKER was observed exiting the Koleski Residence empty-handed. Parker then entered his vehicle and drove away.

18. Approximately two days later, on or about June 30, 2017, law enforcement agents received information from the Farmingdale Post Office that KOLESKI had dropped off multiple garbage bags full of parcels to be shipped out. Between on or about June 30, 2017 and July 5, 2017, over the course of several trips, KOLESKI brought a total of approximately 218 parcels to the Farmingdale Post Office to be shipped out (collectively, the "218 Farmingdale Parcels"). All of the 218 Farmingdale Parcels were paid for using the same Stamps.com Account described in Paragraph 7 above. Law enforcement agents also determined that the Stamps.com Account is registered in

---

[5] From at least May 2016 through in or around December 2016, PARKER resided at the Koleski Residence with KOLESKI. In or around January 2017, PARKER moved to the Parker Residence in Long Island City, New York.

KOLESKI's name at the Koleski Residence address.

19. On or about July 7, 2017 and July 11, 2017, law enforcement agents obtained search warrants for a total of approximately 75 of the 218 Farmingdale Parcels (the "July 2017 Parcels"). During the execution of the search warrants, agents determined that the July 2017 Parcels consisted of a mix of U.S. Priority Mail flat rate envelopes and boxes. Based on information gathered over the course of the investigation, and during the search of the July 2017 Parcels, law enforcement agents determined that, in general, PARKER and KOLESKI use boxes to package and distribute the liquid chemicals sold through the UBC Website, and envelopes to package and distribute the powder chemicals sold through the RCP Website.

20. When the July 2017 Parcels were searched, law enforcement agents also determined that the contents of those parcels were usually clearly labeled to indicate what substance was inside. For instance, one of the July 2017 Parcels, when opened, was found to contain approximately 5 plastic bottles full of a clear liquid, 2 of which were labeled "3-MEO-PCP" ("Analogue Exhibit 20"). The July 2017 Parcel containing Analogue Exhibit 20 was sent on or about June 29, 2017 by "Shipping station" at an address in or around Long Island City, New York. Laboratory testing later confirmed that Analogue Exhibit 20 consisted of approximately 38.927 grams of 3-Methoxyphencyclidine ("3-MEO-PCP").

21. Another of the July 2017 Parcels, when opened, was found to contain approximately 5 gold zip-lock bags, 4 of which contained a granular powdery substance and were labeled "A-PHP" ("Analogue Exhibit 91"). The July 2017 Parcel containing Analogue Exhibit 91 was sent on or about July 3, 2017 with a return address of "Shipping station" at an address in or around Long Island City, New York. Laboratory testing later confirmed that Analogue Exhibit 91 consisted of approximately 8.914 grams of α-Pyrrolidinohexanophenone ("A-PHP").

22. 3-MEO-PCP and A-PHP are each a recognized controlled substance analogue within the meaning of the Analogue Act. 3-MEO-PCP is substantially similar in chemical structure to phencyclidine, or "PCP," a Schedule I controlled substance. Moreover, 3-MEO-PCP has an effect on the human central nervous system that is substantially similar to PCP. Similarly, A-PHP is substantially similar in chemical structure to 1-phenyl-2-(pyrrolidin-1-yl)pentan-1-one ("A-PVP"), a Schedule I controlled substance. A-PHP has an effect on the human central nervous system that is substantially similar to A-PVP.

9

23. The dozens of substances recovered from the July 2017 Parcels are still undergoing laboratory testing. To date, however, laboratory testing performed on the contents of just 5 of the July 2017 Parcels has confirmed that PARKER and KOLESKI shipped at least approximately 60.223 grams of 3-MEO-PCP and approximately 11.093 grams of A-PHP.

### The July 11, 2017 Undercover Purchase of 3-MEO-PCP

24. On or about July 11, 2017, a UC placed an order through the UBC Website for approximately 20 15ml vials of what was advertised as "3-MEO-PCP Liquid" (the "July 11 UC Purchase"). After the order was submitted, the UC received an email from the UBC Email Account attaching an invoice for the July 11 UC Purchase.

25. On or about July 18, 2017, law enforcement agents received a parcel containing the July 11 UC Purchase (the "July 18 UC Parcel"). The July 18 UC Parcel had been shipped on or about July 14, 2017 from "Ship S" at an address in or around Long Island City, New York, and was shipped using the same Stamps.com Account described in Paragraph 7 above. The July 18 UC Parcel was sent to the UC at an address in or around West Orange, New Jersey. When agents opened the July 18 UC Parcel, it was found to contain approximately 19 plastic bottles full of a clear liquid, each of which were labeled "3-MEO-PCP" ("Analogue Exhibit 140"). The July 18 UC Parcel also contained approximately 8 oral syringes. Laboratory testing later confirmed that Analogue Exhibit 140 consisted of approximately 363.5 grams of 3-MEO-PCP.

### The July 13, 2017 Undercover Purchase of 3-MEO-PCP

26. On or about July 13, 2017, a UC placed another order through the UBC Website for an additional approximately 23 15ml vials of "3-MEO-PCP Liquid" (the "July 13 UC Purchase"). Following the order, the UC received an email from the UBC Email Account attaching an invoice for the July 13 UC Purchase.

27. On or about July 17, 2017, law enforcement agents received a parcel containing the July 13 UC Purchase (the "July 17 UC Parcel"). The July 17 UC Parcel had been shipped on or about July 14, 2017 from "Ship S" at an address in or around Long Island City, New York, and was shipped using the same Stamps.com Account described in Paragraph 7 above. The July 17 UC Parcel was sent to the UC at an address in or around Shrewsbury, New Jersey. When agents opened the July 17 UC Parcel, it was found to contain approximately 23 plastic bottles full of a clear liquid, each of which were labeled "3-MEO-PCP" ("Analogue Exhibit 139"). The July 13 UC Parcel also

contained approximately 10 oral syringes. Laboratory testing later confirmed that Analogue Exhibit 139 consisted of approximately 436.2 grams of 3-MEO-PCP.

### The July 26, 2017 Undercover Purchase of A-PHP

28. On or about July 26, 2017, a UC placed another order through the RCP Website for an additional approximately 6 2-gram packages of "A-PHP 2g" (the "July 26 UC Purchase"). Through communications between the UC and an email account associated with the RCP Website (the "RCP Email Account"), PARKER indicated that the UC could pay for the July 26 UC Purchase using a money order addressed to "B.P." at the Parker Residence address (the "UC Money Order"). On or about July 27, 2017, the UC mailed the UC Money Order to the Parker Residence.

29. On or about July 31, 2017, law enforcement agents received information that the UC Money Order had been cashed at a bank in or around Long Island City, New York. Law enforcement agents obtained an image of the cashed UC Money Order, on which PARKER had written his name next to the payee "B.P."

30. On or about August 3, 2017, law enforcement agents received a parcel containing the July 26 UC Purchase (the "August 3 UC Parcel"). The August 3 UC Parcel had been shipped on or about July 31, 2017 from "the station" at an address in or around Long Island City, New York, and was shipped using the same Stamps.com Account mentioned above. The August 3 UC Parcel was sent to the UC at an address in or around Shrewsbury, New Jersey.

31. When agents opened the August 3 UC Parcel, it was found to contain approximately 6 gold zip-lock bags, each of which contained a granular powdery substance and was labeled "A-PHP 2g" ("Analogue Exhibit 141"). Analogue Exhibit 141 is still undergoing laboratory testing, but based on information gathered over the course of the investigation, including the method in which Analogue Exhibit 20, Analogue Exhibit 91, Analogue Exhibit 139, and Analogue Exhibit 140 were labeled by PARKER and KOLESKI, there is probable cause to believe that Analogue Exhibit 141 consists of a quantity of A-PHP.